UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF JOSEPH BIEGERT
by Special Administrator Toni Biegert,

        Plaintiff,

   v.                                                    Case No. 18-C-401

THOMAS MOLITOR,
MATTHEW DUNN,
BRIAN KRUEGER, and
JOHN DOE POLICE OFFICERS #1–10,

        Defendants.

**DECISION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, the Estate of Joseph Biegert by Special Administrator Toni Biegert, brought this action under 42 U.S.C. § 1983, seeking damages against Officers Matthew Dunn and Brian Krueger of the Green Bay Police Department as well as the former Green Bay Chief of Police Thomas Molitor for the fatal shooting of Joseph Biegert on February 24, 2015. Plaintiff claims that Officers Dunn and Krueger violated the Fourth Amendment by using excessive force and conducting an unreasonable search and seizure and violated the Fourteenth Amendment by denying Biegert his right to due process. The court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. The case is before the court on Defendants' motion for summary judgment. Defendants assert that the force used was reasonable under the circumstances and, alternatively, that they are immune from liability under federal law. They also deny Plaintiff's assertion that they conducted an unreasonable search and seizure and that they violated Biegert's right to due process. For the reasons that follow, Defendants' motion will be granted and the case will be dismissed.

## BACKGROUND

Joseph Biegert was an adult resident of the City of Green Bay, Wisconsin. Toni Biegert is Joseph Biegert's mother and an adult resident of the City of Green Bay, Wisconsin. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, Dkt. No. 20. Defendants Matthew Dunn and Brian Krueger are City of Green Bay Police Officers and were so employed on February 24, 2015. *Id.* ¶¶ 2–3. Defendant Tom Molitor is the former Chief of Police for the City of Green Bay Police Department. *Id.* ¶ 4.

On February 24, 2015, Joseph Biegert sent a text message to his mother stating that he had taken a lot of medication in an apparent suicide attempt. *Id.* ¶ 7. Biegert's mother was concerned for his safety and called the Green Bay Police Department (GBPD) to request a welfare check. *Id.* ¶ 8. She advised that Biegert was severely depressed and had a history of suicide attempts. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 2, Dkt. No. 30. At approximately 7:31 p.m., Officers Krueger and Dunn were dispatched to 1511 Plymouth Lane, Apartment E, in the City of Green Bay, Wisconsin for the welfare check. The dispatcher indicated that an adult male, who was later determined to be Joseph Biegert, was at that location. DPFOF ¶ 7. At 7:32 p.m., GBPD learned that Biegert was in the apartment alone, had no access to weapons, and had no access to vehicles. PPFOF ¶ 3. Officer Dunn requested that Rescue personnel be dispatched to the apartment and staged nearby. DPFOF ¶ 9. As Officer Dunn approached the residence, he noticed that Rescue was already on scene at the corner of Plymouth Lane and Fisk Street. *Id.* Officer Dunn was the first to arrive at Biegert's apartment, and Officer Krueger ran to catch up to Officer Dunn once he arrived. PPFOF ¶ 6. The officers did not report having any detailed conversation or plan to interact with Biegert before entering the building or Biegert's apartment. *Id.* Officers Krueger and Dunn entered

2

the building and went to Apartment E, which was located on the second floor at the top of the stairs. DPFOF ¶ 10.

As the officers approached the apartment, GBPD received a call from Biegert at 7:39 p.m. Biegert indicated that he believed an unknown number of people were outside the door and wanted to hurt him and then hung up the telephone. PPFOF ¶ 5. During Biegert's call with dispatch, Officer Dunn knocked on Biegert's apartment door. DPFOF ¶ 11. A male inside of the apartment asked who it was, and Officer Dunn responded that it was the police. The male replied, "OK," and paused. *Id.* The officers heard the male walk away from the door, rummage for something, then return and open the door. *Id.* Officer Dunn was suspicious and had his guard up due to Biegert's delay in answering the door. *Id.* Plaintiff contends that Biegert delayed opening the door because he was on the telephone with dispatch. PPFOF ¶ 9. Officers Krueger and Dunn were not advised that Biegert was on the telephone with dispatch at the time they knocked on his apartment door. *Id.* ¶ 11.

Once Biegert opened the door, the officers confirmed Biegert's identity, and Biegert stated that he was depressed. DPFOF ¶ 12. Officer Dunn observed that Biegert had hunched shoulders indicative of a depressed individual and asked if he and Officer Krueger could enter the apartment to speak with him. *Id.* ¶¶ 12, 60. Biegert allowed both officers into his apartment. *Id.* ¶ 12. The apartment was cramped due to the amount of debris inside and the position of the furniture. *Id.* ¶ 17. Upon entering the main living area of the apartment, Officer Krueger observed three opened pill bottles and loose pills lying on the floor. *Id.* ¶ 13. Officer Krueger asked Biegert how may pills he ingested, and Biegert responded, "three." Officer Krueger thought Biegert may have ingested three bottles of pills as a result of the three containers he saw on the floor. *Id.*

3

Shortly after entering the apartment, the officers heard sounds in the bedroom. *Id.* ¶ 14. Officer Dunn asked Biegert who else was in the apartment, and Biegert responded that he did not know. *Id.* The officers became suspicious and cautious, and Officer Krueger wanted to ensure no one else was present or that an individual did not jump out of a window. *Id.* Officer Krueger stayed in the living room with Biegert while Officer Dunn conducted a protective sweep of the apartment. *Id.* ¶ 15. Officer Dunn went to the bedroom and found that a shade in front of the open window was making the noise they had heard. *Id.* He then checked the bathroom and back closet and concluded no one else was in the apartment. *Id.* Officer Dunn advised that the apartment was clear and returned to the living room. He observed Biegert seated on a sofa located behind another sofa. *Id.* Officer Dunn also noticed a knife block on the kitchen counter but did not secure the knife block before entering the living room. PPFOF ¶¶ 17–18.

The officers then advised Rescue personnel that Biegert admitted taking pills. DPFOF ¶ 16. Officer Krueger noticed Biegert put his left hand inside of a pocket and told Biegert to remove his hand from his pocket. *Id.* ¶ 18. Biegert complied but appeared nervous. *Id.* Officer Krueger asked Officer Dunn to pat down Biegert for weapons for the safety of the Rescue personnel. *Id.* ¶ 19; PPFOF ¶ 22. Officer Dunn did not suspect that Biegert was armed and believed Biegert was going to accept the officers' help but anticipated that Biegert was going to the hospital in an ambulance and did not want to leave an armed individual with the ambulance crew. DPFOF ¶¶ 16, 19.

Biegert stood in a narrow space between a sofa and a chair in the living room. *Id.* ¶ 22. Before frisking Biegert, Officer Dunn asked Biegert to put his hands behind his back, and Biegert complied. *Id.*; PPFOF ¶ 25. Officer Dunn held onto two of Biegert's fingers with his left hand to control Biegert and later conceded that this hold may have been painful for Biegert. PPFOF

4

¶¶ 26–27. Officer Dunn requested that Biegert take a step forward because they were in a crowded space, and Biegert complied. *Id.* ¶ 26; DPFOF ¶ 22. As Officer Dunn performed the pat down, Officer Krueger rolled the pill bottles on the floor with his foot to determine what type of medication the bottles contained so he could provide that information to Rescue personnel. DPFOF ¶ 20. Officer Krueger took out his flashlight and advised dispatch via his portable radio that Rescue personnel could approach. *Id.* ¶ 21.

When Officer Dunn started to pass his hand across Biegert's front belt area, Biegert stated something like "what are you doing?" *Id.* ¶ 22. Biegert then began to pull away, and his right hand came loose from Officer Dunn's grasp. *Id.* ¶ 23. Officer Krueger grabbed Biegert's left hand while Officer Dunn grabbed Biegert's right and tried to return Biegert's hands to the small of his back. *Id.* Biegert attempted to pull his arms away from the officers, and Officer Dunn felt resistive tension in Biegert's arms. *Id.* Biegert pulled the officers toward the kitchen, and Officer Krueger stated, "Don't do anything stupid." *Id.* ¶ 24. Officer Krueger dropped his flashlight and tried to grab Biegert's left side to gain an escort hold and decentralize Biegert, so that he could place Biegert in handcuffs for their safety. *Id.*

When the officers and Biegert reached the kitchen area, Officer Dunn put his leg in front of Biegert to impede Biegert's movement, which resulted in Biegert and Officer Dunn falling to the floor. *Id.* ¶ 25. Officer Dunn fell onto his right side with his back toward the island that separated the kitchen and living room areas. *Id.* Biegert landed on Officer Dunn's legs and prevented him from standing. *Id.* Biegert got up off the floor and pulled the officers into the galley-sized kitchen near the stove. *Id.* ¶ 26. All three then fell to the floor. *Id.* Officer Krueger thought Officer Dunn was somewhere under Biegert, who was on his back looking upward or toward Officer Krueger.

*Id.* ¶ 28. Officer Krueger straddled Biegert's body and attempted to gain control of him, but Biegert was thrashing about and exerting his strength. *Id.*

Officer Krueger drew his Taser, saw that Biegert's mid-section was exposed, and attempted to place his Taser on Biegert's exposed mid-section in an effort to control him. *Id.* ¶ 29. When Officer Krueger engaged the Taser, he did not hear the normal "pop" sounds that would indicate that the Taser probes were released and made contact with Biegert. *Id.* Instead, Officer Krueger heard an arching sound and saw the Taser emanate blue and purple lights. *Id.* The Taser had no effect on Biegert, and Biegert became more animated and angry. *Id.* ¶ 30. Officer Krueger rocked the Taser on Biegert's mid-section, trying to create some effect and stun Biegert. *Id.*

Biegert put his hand between Officer Krueger's legs near his groin area, grabbed Officer Krueger's genitalia, and squeezed hard, causing Officer Krueger to yell loudly. *Id.* ¶ 31. Biegert then reached to either parry Officer Krueger's Taser or grab it. *Id.* Officer Krueger knocked his Taser out of Biegert's hand as he yelled to Officer Dunn that Biegert had his Taser. *Id.* Officer Krueger did not want to deploy his OC spay because it would have negatively affected both officers, and he instead performed focused strikes with a closed hand to Biegert's face. *Id.* ¶ 35. Although the room was dark, Officer Dunn could see that Officer Krueger was striking Biegert and that it was having no effect. *Id.* ¶ 36. Biegert continued to attempt to get up, and Officer Dunn attempted to control Biegert by grabbing his arms and pulling him to the ground. *Id.* Biegert was thrashing around and struggling with the officers in the corner of the kitchen, and his face or head contacted either the stove or cupboards. *Id.* Because Officer Krueger's directed strikes were not having any effect, he drew his baton from his duty belt and began to expand it while Biegert continued to thrash

and fight. Biegert was bucking up and down in an attempt to throw Officer Krueger off of him. *Id.* ¶ 37.

In the meantime, Officer Dunn retrieved his Taser and attempted to direct it into Biegert's abdomen. *Id.* ¶ 32. Biegert moved out of the way of the Taser, resulting in Officer Dunn using the Taser on Officer Krueger. *Id.* After Officer Dunn deployed his Taser, Biegert knocked the Taser out of Officer Dunn's hand. *Id.* ¶ 34. Once he was tased, Officer Krueger, who was squatting above Biegert, suddenly locked up, his body became rigid and stiff, and he felt Biegert's momentum raise him. *Id.* ¶ 38. Officer Krueger then received a second Taser cycle, which caused him incapacitating pain. *Id.* ¶ 39. When the second Taser cycle ended, Officer Krueger expanded his baton and prepared to use the baton to perform strikes on Biegert, who was one-half to three-quarters standing. *Id.* ¶¶ 39, 40.

Officer Dunn was still on the ground on his back when Biegert accessed the kitchen counter top, and he did not know Officer Krueger's position. *Id.* ¶ 51. Biegert came back from the counter top, stood over Officer Dunn, drew his right hand back, and revealed a long knife. *Id.* ¶ 41. Biegert lunged at Officer Dunn's throat or chest with the knife, and Officer Dunn used his left arm to deflect the thrust. *Id.* ¶ 42. The knife went over Officer Dunn's shoulder. Biegert then drew his right hand back and came at Officer Dunn again. *Id.* Officer Dunn started to draw his pistol and used his left hand to deflect the knife, this time to his right side. *Id.* Biegert withdrew the knife and pushed it toward Officer Dunn again. *Id.* ¶ 43. Officer Dunn heard screaming but doesn't recall who was screaming. *Id.* After Biegert's third attempt to stab Officer Dunn, Officer Dunn felt a sting in his right arm. *Id.* Officer Dunn yelled that he had been stabbed or that Biegert had tried stabbing him

7

and removed his sidearm from the holster. *Id.* ¶¶ 44, 46. Biegert stood facing Officer Dunn, and Officer Dunn saw that Biegert still held the knife in his right hand. *Id.* ¶ 46.

Officer Krueger did not know where Officer Dunn had been stabbed or how severe the injury was. *Id.* ¶ 44. Upon learning that Biegert had a knife, Officer Krueger threw his baton to keep it from potentially being used by Biegert. *Id.* ¶ 45. As soon as Officer Krueger discarded his baton, Biegert turned toward him, and Officer Krueger saw that Biegert held a knife with a blade that was approximately 10 inches long. *Id.* ¶ 47. As Biegert turned toward Officer Krueger, Officer Krueger drew his service pistol from his holster and simultaneously stepped back. *Id.* ¶ 48. Biegert continued to step toward Officer Krueger, so Officer Krueger fired his weapon at Biegert to stop any attack. *Id.* Officer Dunn held his pistol in front of him and began firing because he believed Biegert was going to return and attempt to kill him with the knife. *Id.* ¶ 49. As Officer Dunn fired his weapon, Biegert started to turn to his left and then fell. *Id.* Biegert's head fell back, and he landed on his back with his hands above his head. *Id.* ¶ 50. He still held the knife in his right hand. *Id.* The knife had a brown-colored handle and appeared to be one of the knives from the block set in the kitchen. *Id.* Once Biegert was on the ground, Officer Krueger moved around the corner behind the entrance hallway wall on the opposite side of the kitchen. *Id.* ¶ 51. He directed Biegert to not move. *Id.*

Officer Dunn saw that Officer Krueger was not in the kitchen at the time and did not know if Biegert was turning to attack Officer Krueger as Officer Dunn was firing. Officer Dunn did not remember hearing any gunshots. *Id.* ¶ 52. He stood and conducted an in-battery reload and placed the magazine from which he had fired on his duty belt. *Id.* ¶ 53. After reloading his weapon, Officer Dunn did not fire it again but pointed it at Biegert, who remained on the ground, unmoving. *Id.* Both officers ordered Biegert to drop the knife and to not move. *Id.* Biegert had shallow, raspy

breathing that eventually stopped, and Officer Krueger asked Officer Dunn how he was. *Id.* Officer Dunn initially responded that he was alright but then advised that he had a tear in his right uniform sleeve and was bleeding because he had been stabbed. *Id.* ¶ 54. Officer Krueger relayed that information over the radio. *Id.* Another individual asked for Rescue personnel to enter the apartment. *Id.* ¶ 55. Officer Krueger responded that Rescue personnel could not come to the apartment, that the suspect was down, that Officer Dunn was stabbed, that Officer Krueger was alright, and that they needed more police officers. *Id.* Officer Dunn continued to hold his gun on Biegert, who still held the knife in his right hand. *Id.* ¶ 56.

Additional GBPD officers arrived shortly thereafter. *Id.* ¶ 57. Officer Krueger directed Officer Dunn to walk the perimeter of the room so that he could exit the apartment, and Officer Dunn walked to the far corner of the apartment and then out of the apartment to the hallway. *Id.* Although Officer Krueger continued to visually cover Biegert in the event that he re-engaged with the knife, *id.* ¶ 58, Biegert never moved again. *Id.* ¶ 59. Officer Dunn attempted to re-enter the apartment with Officer Meisner, who had arrived to provide assistance. *Id.* Both Officers Krueger and Meisner told Officer Dunn to go outside to the ambulance. *Id.* Officer Dunn sprinted to the ambulance, knocked on the door, and told the crew that he had been stabbed. *Id.* The Rescue personnel found two stab wounds to Officer Dunn's right bicep. *Id.* Approximately two minutes had passed from the time the officers knocked on Biegert's apartment door to the time Biegert was shot.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

9

In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

**A. Excessive Force**

The court first considers Plaintiff's Fourth Amendment excessive force claim. Although police officers "are entitled in appropriate circumstances to use force, up to and including deadly force," the Constitution "forbids the use of excessive force." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). A claim that police officers have used excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In analyzing an excessive force claim, the court is required to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This analysis is highly fact-intensive and "requires careful attention to the facts and circumstances of each particular case." *Id.* (citations

omitted). "[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *see also Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985))).

The court's analysis of the objective reasonableness of an officer's actions must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 395. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Officers Dunn and Krueger claim that their use of deadly force is justified because they were faced with an imminent threat of death or great bodily harm. Plaintiff contends the officers cannot escape liability because they created the danger they faced and unnecessarily escalated the situation resulting in their use of excessive force. Pl.'s Br. at 9. Plaintiff claims that, had the officers merely retreated from the apartment when Biegert began passively resisting during the pat search, the situation would not have escalated. Indeed, "officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others."

11

*Williams v. Ind. State Police Dep't*, 797 F.3d 468, 485 (7th Cir. 2015). But in this case, Biegert was not passively resisting. The facts undisputed by Plaintiff are themselves sufficient to establish that the officers only used force after Biegert began physically fighting and resisting the officers. Officers Dunn and Krueger arrived at Biegert's apartment for a welfare check and had no reason to be concerned for their safety initially. When Biegert began resisting by pulling the officers into the kitchen, assaulting Officer Krueger, grabbing the officers' Tasers, and fighting the officers, Officers Dunn and Krueger used non-lethal force against Biegert, including an escort hold, Taser, baton, and focused strikes. It was not until Biegert brandished a knife and stabbed Officer Dunn that the situation became imminently dangerous and the officers used deadly force.

Any reasonable officer in the position of Officers Dunn and Krueger would have believed that Biegert, who had a knife and had stabbed an officer, posed an immediate and serious threat to the officers. The Seventh Circuit has repeatedly held that when, as here, an individual places law enforcement officers in imminent danger of death or serious bodily injury, the officers may use deadly force against the individual. *See Williams*, 797 F.3d at 484 ("It is well-established . . . that a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." (internal quotation marks and citations omitted)); *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009) ("[I]t is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others."); *Muhammed*, 316 F.3d at 683 ("Deadly force may be used if the officer has probable cause to believe that the armed suspect . . . 'poses a threat of serious physical harm,

either to the officer or to others.'" (quoting *Tennessee*, 471 U.S. at 7)); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc) ("[W]hen an officer believes that a suspect's actions place[] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." (emphasis, citations, and quotation marks omitted)).

Plaintiff nevertheless claims that the officers' conduct was unreasonable and that they should be held liable for the foreseeable consequences of that conduct. In particular, Plaintiff asserts that the officers failed to make an adequate plan for handling Biegert before entering his apartment; the officers should have interacted with Biegert in the hallway, rather than enter his apartment; Officer Dunn should have secured the knife block in the kitchen; and the officers should have more clearly indicated that they were performing a pat search. But to find that Officers Dunn and Krueger should have been more careful would be to judge their actions with the improper benefit of 20/20 hindsight. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) (citation omitted). There is no guarantee that, had the officers changed their course of conduct in any way, the result would have been different. As the Seventh Circuit stated in *Bell v. Irwin*: "It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act." 321 F.3d 637, 640 (7th Cir. 2003). Biegert's death was certainly tragic. But the officers were faced with a dangerous and difficult situation, and they acted objectively reasonably under the circumstances. To the extent Plaintiff claims that the number of rounds the officers shot was excessive, "[n]othing in the Fourth Amendment barred [the officers]

from protecting themselves, even though it meant firing multiple rounds." *City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (citation omitted). Officers Dunn and Krueger did not violate Biegert's Fourth Amendment rights when they used deadly force against him. Because the court concludes that the officers did not violate Biegert's constitutional rights, there is no need to address their qualified immunity defense. Officers Dunn and Krueger are therefore entitled to summary judgment on Plaintiff's excessive force claim.

**B. Search and Seizure**

Officers Dunn and Krueger maintain that they did not violate Biegert's Fourth Amendment right to be free of unreasonable searches and seizures when they searched Biegert prior to Rescue personnel entering his apartment. The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 335–36 (7th Cir. 2011) (citation omitted). Warrantless searches are unreasonable under the Fourth Amendment unless exigent circumstances and probable cause exist or consent is given. *See Reardon v. Wroan*, 811 F.2d 1025, 1027–28 (7th Cir. 1987).

Plaintiff argues that the officers should have detained Biegert when he first answered the door in accordance with Wisconsin's community caretaker exception, Wis. Stat. § 51.15. But the statute does not mandate that an officer arrest a suicidal individual in every instance, and the Wisconsin Supreme Court has identified four factors police officers should consider in determining

whether to detain an individual. *See State v. Horngren*, 238 Wis. 2d 347, 617 N.W.2d 508 (2000). Given the fact that Biegert was initially cooperative and did not pose a threat to the officers when they first approached his apartment, it may not have been proper to immediately detain Biegert at the time he opened his apartment door. Biegert consented to the officers' request to enter his apartment. Once inside, the officers noted the presence of the open and spilled pill bottles on the floor and that Biegert was nervous, and they heard a noise coming from the bedroom. After the officers determined the apartment was clear, Officer Krueger instructed Officer Dunn to perform a frisk search of Biegert to ensure Biegert was not armed before bringing him to Rescue personnel. The Seventh Circuit has recognized that an exception to the Fourth Amendment's prohibition on warrantless searches is a search incident to arrest or detainment. *See Peals v. Terra Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008). Under this exception, "police officers may, incident to arrest, conduct a plenary search of the arrestee's person and the area within his immediate control, that is, the area from within which he might gain possession of a weapon or destructible evidence." *Id.* (internal quotation marks and citation omitted). In short, the protective pat down and custodial search of Biegert's person were reasonable and did not violate the Fourth Amendment.

**C. Due Process**

Plaintiff claims the officers denied Biegert due process under the Fourteenth Amendment when they failed to follow GBPD's policies regarding Assessing Risk, Search and Seizure, and Emergency Detentions. But § 1983 only "protects plaintiffs from constitutional violations, not violations of state laws, departmental regulations or police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). In other words, violations of police regulations and policies are "completely immaterial as to the question of whether a violation of the federal constitution has been

15

established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). In short, Plaintiff has failed to establish that he is entitled to summary judgment on his Fourteenth Amendment due process claim.

**D. Defendant Molitor and John Doe Defendants**

Defendants contend that Molitor must be dismissed as a defendant because Plaintiff has not established that he had any involvement in the incident. Section 1983 does not provide a cause of action against individual supervisors based upon their supervisory role over another person. *See Odogba v. Wis. Dep't of Justice*, 22 F. Supp. 3d 895, 909 (E.D. Wis. 2014) (citing *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 699 n.58 (1978); *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir. 1984)). Because Plaintiff has not established that Molitor was directly involved in the incident, he will be dismissed as a defendant in this action. Plaintiff's claims against John Doe Police Officers #1–10 will also be dismissed because Plaintiff has not identified the Doe Defendants in a timely manner.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 18) is **GRANTED** and the case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this __30th__ day of August, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
